CASE No. 1052.

STATE v. WHITE.

1. At the drawing of talesmen in open court, the sheriff was within the bar, but did not see the drawing of one of the names. *Held,* no ground for arrest of judgment.

2. In a murder case the names of jurors were drawn from the hat by a boy supposed at the time to be under ten years of age, but who was really over that age. *Held,* that this unintentional violation of the rule of court furnished no ground for arresting the judgment.

3. In an unimportant phrase of the indictment—one that could not possibly have misled and might have been rejected as surplusage—the defendant was wrongly named. *Held,* an immaterial variance.

4. False spelling, which does not make another word representing a different thing, will not vitiate an indictment. *Raysor* for razor is therefore an immaterial misspelling.

5. The conclusion " *contra formam statuti* " does not impair the validity of an indictment for murder at common law.

6. Where the purpose is to impeach the credit of a witness by evidence of his contrary statements, he should be distinctly advertised as to the time when, the place were, and the person to whom such contrary statements were made; but it is not necessary to warn him of the purpose to contradict.

7. Where the witness is the defendant on trial under indictment, this rule applies if the contrary statements are offered to impeach his credit as a witness, although such statements might be admissible under the proper rules, if offered in proof of his admissions relative to the matters in issue.

8. But *quere*: Can the character of a defendant on trial in a criminal case, who has testified under the permission of the statute, be impeached by attacking in any manner his credit as a witness?

9. It being conceded that the defendant had inflicted the fatal wound, the trial-judge violated Article IV., Section 26, of the constitution, in charging

the jury "that no doubt a cruel, brutal and savage homicide had been committed," notwithstanding a closing admonition that the jury were the sole judges of the facts and should not be bound by his opinion upon them. This provision of the constitution considered and construed.

Before ALDRICH, J., Colleton, March, 1880.

The defendant, Gabriel White, was indicted for the murder of Frederick Bellinger in January, 1880. At the trial, the original panel having been exhausted, the names of talesmen including some who resided more than five miles from the court house, were placed in the hat. During the drawing, the sheriff stepped aside to speak to some one, at which moment the name of a juror was drawn, the sheriff not seeing it. These matters were excepted to at the time, and for these causes the array, when completed, was challenged. The names of the jurors were drawn from the hat by a boy eleven years of age, but supposed by all parties at the time to be under ten. The mistake was discovered before any evidence was given, and was at once objected to by the defendant's counsel.

The only point arising out of rulings upon testimony, relates to the contradiction of the defendant, White, and is fully stated in the opinion.

The defendant was found guilty. He submitted several grounds in arrest of judgment and on motion for new trial, all of which were overruled, and the defendant was sentenced to be hung. He appealed to this court.

The report of the presiding judge upon the points decided, was as follows:

### JUDGE'S REPORT.

In looking over my notes of trial, I find that parts of my charge were written out and I give the language used. I commenced by instructing the jury that the misnomer in the indictment was not fatal, as it is not a material allegation and might have been left out altogether without affecting the indictment. That no doubt a cruel, brutal and savage homicide had been committed. The question is, did the prisoner at the bar kill the

deceased with malice aforethought? If he did, it is murder. Murder was then clearly and distinctly defined. I did tell the jury that " so cowardly is this kind of assassination considered by the appointed law-makers of the country, that they have gone so far in order to prevent it, to enact that " and read the clause at page 709 of General Statutes. The jury was dismissed to their room with the admonition that the law makes them the sole judges of the evidence and that the judge can express no opinion on the facts, or if he does they are not bound by it.

As to the talesmen, I held that was a question for the jury commissioners and the court could not be delayed to try the issue of distance from the court-house, which might involve a survey.

As to the boy who drew the jury, his father informed the sheriff that he was under ten years of age; he drew the names from the hat without objection and I ruled that the objection came too late. The drawing was perfectly fair in the presence of the court.

I am not aware that the sheriff was absent from the hat while the names were being drawn, but am certain that he did not leave the court room or go outside of the bar.

As to the spelling of the word razor, I held it was the same sound and overruled the objection. No one was misled.

I made no direction under the statute of James—it was simply used as an illustration.

The appeal was taken upon the same grounds submitted to the court below for new trial and in arrest of judgment, and are substantially stated in the opinion of this court. The first seven were relied upon on the motion for arrest of judgment, and the remaining two were the grounds for a new trial.

*Messrs. Tracy & Tracy* and *Rice & Rice,* for appellants.

*Mr. Solicitor Gantt,* contra.

July 14th, 1881.   The opinion of the court was delivered by McIVER, A. J.   The defendant was indicted for the murder of Frederick Bellinger, by cutting him with a razor, and, upon

his conviction, submitted motions for a new trial and in arrest of judgment upon numerous grounds set out in the "case." The Circuit judge refused the motions, whereupon this appeal is brought, based upon the same grounds. We propose to consider only those which were relied upon in the argument here, and which are as follows :

1. Because three of the talesmen drawn to supply deficiencies in the jury resided more than five miles from the court-house, and one of them was placed upon the jury which tried the case.

2. Because the sheriff was not actually present and did not see the drawing of all of the talesmen.

3. Because the names of the jurors were drawn from the hat by a boy over the age of ten years.

4. Because the indictment charged that Frederick Bellinger died from wounds inflicted on *Gabriel* Bellinger.

5. Because the indictment charged that the fatal wounds were inflicted with a "*raysor*" and not with a razor.

6. Because the indictment was an ordinary indictment for murder at common law, and would not support a conviction under the statute of 1 *Jac.* 1, for stabbing and thrusting, "as was directed in the judge's charge."

7. Because the proof of "cutting" would not support a conviction for "*stabbing and thrusting*" under that statute, "as charged by his Honor."

8. Because the testimony of James Campbell, introduced for the purpose of contradicting Gabriel White, as a witness, was improperly admitted, inasmuch as White was not warned before the question was put, that the purpose was to contradict him, and was not advertised of the *place* at which it was alleged he had made a different statement.

9. Because the Circuit judge, in his charge to the jury, expressed his opinion, in very decided terms, as to the character of the homicide, in violation of the provisions of the constitution.

As to the first ground we do not think it necessary to make any observations, inasmuch as we are compelled to grant a new trial upon another ground, and, as the law in this respect has been changed, the same question cannot very well arise upon another trial.

2. The second ground cannot be sustained, for it appears that the sheriff was within the court-room, and the Circuit judge says, "did not go outside the bar" while the drawing was going on. This, we think, was sufficient, and that it is not necessary, that each of the three officers named in the statute should, at every moment of time during the progress of the drawing, have his eyes fixed on the hat or other receptacle from which the names of the jurors are drawn. The sheriff was within reach and where he could see what was going on; and probably one reason for the requirement that three officers should attend at the drawing was to provide against the very thing here complained of—the momentary inattention of one of them—inasmuch as that was likely, if not almost certain, to occur in every instance. ·

Again, the statute (December 24th, 1878, 16 *Stat.* 803,) does not require that each of the officers there mentioned shall personally inspect each name as it is drawn; it simply requires the jury commissioner "to attend in open court, together with the clerk of the court and the sheriff," and under the direction of the court to draw such number of jurors as may be needed. All this was complied with in this case. These officers did "attend in open court" and "under the direction of the court" did draw the names of the jurors, and the mere fact that the sheriff, who also had other public duties to perform, stepped aside for a moment to speak to some one, cannot vitiate the drawing. In fact, if the sheriff had been absent from the court-room we do not see how the drawing would have been illegal, for the statute above cited declares that these officers shall proceed to supply the deficiency "in the same manner as the board of jury commissioners are now authorized by law to do," and by the law as it then stood the drawing was to be made by the board of jury commissioners *or a majority of them.* So that the absence of the sheriff only would leave a majority of the officers designated for that purpose, and we see no reason why a drawing by such majority would not be legal.

3. The next inquiry is, whether the fact that the boy by whom the names of the jurors were drawn from the hat was over ten years of age, is necessarily fatal. There is no statutory requirement upon this subject, but the twenty-fifth rule of the Circuit

2 B

court does require that the drawing shall be by " a child under ten years of age." This, however, is merely directory, for the purpose of securing an impartial drawing, and when the object is effected we do not see how the failure to comply with the mode prescribed by a mere rule of court for effecting that object, can be allowed to vitiate the whole proceeding. If this require-ment were in the form of a statutory enactment, then, of course, no court would have the power to dispense with it. But rules of court are designed simply to secure the orderly and proper conduct of business, and it is not so essentially necessary that they should be observed as statutes, for the court may, upon proper occasions, suspend them or dispense with their strict ob-servance. By Rule 25, it is required that "upon the trial of any person charged with an offence for which the law requires that he should be arraigned, the prisoner shall be placed in the dock." Now, surely it would not be contended that the failure to comply with this requirement would vitiate the whole pro-ceedings.

It is not suggested, even, that any injury resulted to the pris-oner from the accidental and unintentional failure to comply with this rule, and, on the contrary, the Circuit judge reports that the drawing was perfectly fair and impartial. Indeed, all parties supposed at the time that the rule was being complied with strictly. Even the father of the boy who drew the jury believed he was under ten years of age, and it was not until afterwards that he discovered his mistake by an inspection of the record, which showed that the boy was, in fact, eleven years of age. This ground cannot be sustained.

4. The next question is, as to the variance in the indictment, caused by a clerical error, doubtless, in substituting " Gabriel " for " Frederick," in one part of the indictment. The portion of the indictment in which the variance occurs, reads as follows: " That Gabriel White, * * * in and upon one Frederick Bellinger, * * * did make an assault, and that the said Gabriel White, with a certain *raysor*, of the value of one dollar, which the said Gabriel White, in his right hand, then and there, had and held, the said Frederick Bellinger, in and upon the left side of the neck, and in and upon the right arm, (of him, the

said *Gabriel* Bellinger,) then and there feloniously, willfully, and of his malice aforethought, did strike, thrust and cut, giving to the said Frederick Bellinger, then and there, with the raysor aforesaid, in and upon the left side of the neck, and in and upon the right arm of him, the said Frederick Bellinger, two mortal wounds," &c.

It is very manifest that the error, to which exception is here taken, is purely clerical, but still this would be fatal if it occurred in a material part of the indictment and in any way obscured the sense of the passage in which it occurred, or even tended to mislead the accused as to the precise nature or character of the charge which he was called upon to answer. Here, however, that portion of the indictment in which the error occurs might very well have been left out as surplusage, for, without it, all the facts material to the charge brought against the accused are well and sufficiently stated, and it is impossible that the accused could have been misled as to the nature or character of the charge which he was called upon to answer, or as to any of the details respecting it. Omit the words in parenthesis, in the foregoing extract from the indictment, and there remains enough to show clearly that the accused was called upon to answer a charge of murder committed on the person of Frederick Bellinger, by cutting him on the neck and on the arm with a razor, and the insertion of these words could not tend, in the least degree, to obscure the sense of the passage in which they occur, or to leave any doubt upon the mind of the accused, either as to the nature of the crime with which he was charged or of the particular details attending its commission. We think, therefore, that there is nothing in this ground. 1 *Chitty on Cr. L.* 173, 295, 296; 1 *Leach* 109; *Rex* v. *Dowlin,* 5 *T. R.* 311; *State* v. *Wimberly,* 3 *McC.* 190.

5. The next question is of a kindred character, and depends upon the same general principle. The misspelling of the word "razor"—the instrument with which the wound was inflicted—cannot vitiate the indictment. The rule laid down in 1 *Bish. on Cr. Pro.,* § 357, (2d ed.), is that a clerical error, if not of such a character as would mislead a person of common understanding, will not vitiate an indictment. It seems to be well established

that mere false spelling which does not alter the meaning of the
term, and does not make another word different from that in-
tended, will not vitiate an indictment. As, for instance, in 1
*Leach* 134, 145, where "*undertood*" was used for "*understood*,"
"*recevd*" for "*received*." In *State* v. *Molier*, 1 *Dev.* 263, "*sive*"
for "*sieve*." In *State* v. *Shepherd*, 8 *Ired.* 195, "*tweflth*" for
"*twelfth*." In *State* v. *Hedge*, 6 *Ind.* 330, "*fifty-too*" for "*fifty-
two*," and in *State* v. *Crane*, 4 *Wis.* 400, "*assalt*" for "*assault*;"
in all of which cases the misspelling was held to be immaterial.

The case of *State* v. *Caspary*, 11 *Rich.* 356, is not in conflict
with these cases, for there, by the misspelling, another word
different from the one intended was formed. In that case the
indictment was for bastardy, and the word "*father*" was written
"*farther*," and the judgment was arrested, but in that case it is
said "clerical and grammatical errors which do not affect the
sense will be ordinarily disregarded, but where the omission or
addition of a letter makes a change of the word, *so as to make
another word*, it becomes material when it occurs in certain parts
of an indictment," and it was suggested that if the word had
been written "*faether*," the result would have been different,.
"for that would not be a different word."

There is an old case decided in North Carolina about the be-
ginning of the present century, (*State* v. *Carter*, *N. C. Conf.* 210,
*by Cameron and Norwood*,) which seems to be in conflict with
the position above taken. In that case, in an indictment for
murder, in describing the locality of the wound, the word "*breast*"
was written "*brest*," and the error in spelling was held fatal on
a motion in arrest of judgment. That case, however, was de-
cided by a divided court and no authorities were cited to sustain
the decision; it does not appear to have been recognized since,.
and, on the contrary, is directly in conflict with two subsequent
cases in the same state, (*State* v. *Molier* and *State* v. *Sheppard*,
*supra*,) and it is expressly disapproved by that eminent author,
Bishop, in his work on Criminal Procedure, Vol. I., § 354, 2d
edition. We cannot, therefore, regard the case as entitled to
any weight.

Now, in the case under consideration, the misspelling of the
word "*razor*" does not result in the formation of another word,

for we know of no such term in the English language as "*ray-sor*," and even if it be true, as asserted in the argument, although there is no evidence of the fact, that the word "*Raysor*," is a *proper* name, still we do not think that this would affect the question, for the misspelling, to make it fatal, must be such as to constitute another word designating *a thing* and not *a person.* If, for example, in an indictment for murder the weapon used should be described as a " double-barreled shot-gunn," we do not think the additional "*n*," in spelling the word "gun," would be fatal because there happen to be *persons* known by the name of " *Gunn.*"

6. The next ground seems to be based upon a misapprehension of the judge's charge. He says that he only referred to the statute of 1 *Jac.* 1, by way of illustration and not as being the law under which the accused was being tried. There is nothing, therefore, for this ground to rest upon.

7. So, too, with the seventh ground. It is very manifest that the indictment was not framed under that statute, but was an ordinary indictment for murder at common law, and the conclusion, " contrary to the form of the statute," cannot impair the validity of the indictment, as such conclusion may be rejected as surplusage.

8. The next inquiry is as to the competency of the testimony of the witness James Campbell. It seems that when the prisoner was on the stand he was asked if he had not said, on January 15th, 1880, that " he would have to cut somebody," and that he denied saying so. When Campbell was offered as a witness to prove that he had made use of such language, objection was made upon the ground that the proper foundation for contradicting White had not been laid, inasmuch as when he was asked the question as to whether he had used such an expression, he was not warned before he answered of the purpose to contradict him ; and, also, because he had not been advertised of the *place* where he was alleged to have used such language.

Where the purpose is to impeach the credit of a witness by proof that he has made statements out of court contrary to what he has testified at the trial, the rule is that the witness shall be advertised distinctly as to the particular circumstances attending

the contrary statement which it is proposed to prove by asking " as to the time, place and person involved in the supposed contradiction." 2 *Phillips on Ev.* 959 ; 1 *Greenl.*, § 462. But we are not aware of any rule which requires that the witness should be warned before he answers of the intention to contradict him, in case he denies having made the statement which it is proposed to prove, in any other way than the character of the preliminary questions as to the time when, the place where and person to whom such contrary statement is alleged to have been made, would be likely to do.

So that the only real objection to Campbell's testimony, if it should be considered as offered to contradict the testimony of White and thereby discredit him, is that White was not asked, when on the stand, as to the *place* where the contradictory statement proposed to be proved was made. This would seem to constitute an insuperable objection to the testimony, if offered with the view to discredit White, for as Mr. Greenleaf, in the same section above cited, after laying down the rule as above stated and giving the reasons for it, says : " This course of proceeding is considered indispensable from a sense of justice to the witness," and we see no reason why a failure to comply with that portion of the rule which requires that the attention of the witness, whom it is proposed to contradict, should be called to the *place where* the supposed contrary statement was made, would not be just as fatal as a failure to comply with another portion of the rule which requires that the attention of the witness should be called to *the person to whom* such contrary statement is alleged to have been made ; and this every one would concede would be an omission fatal to the introduction of the testimony to contradict the witness.

It is to be observed, however, that White was not an ordinary witness but was the party accused and, under the statute, was only permitted " to testify as to the facts and circumstances of the case," (*Gen. Stat.* 517,) and it may admit of grave question whether his character could be impeached either in the manner suggested or in any other way ; but as this is an important question not raised in the record and not argued in this case, we do

not propose upon this occasion to do more than merely suggest the question, without undertaking now to decide it.

There is, however, one view under which the testimony of Campbell might be admissible. White being the party accused, it would be competent to prove any statement or declaration previously made by him relative to the matters in issue, subject, of course, to the rules regulating evidence of confessions or admissions and subject also to the rule as to evidence in reply, even if when on the stand he had been asked nothing about such previous statements or declarations, or if he had not been put upon the stand at all. What the purpose was in introducing Campbell as a witness is not very clear from the statement of the case furnished us, but we infer from the argument here that the object was to impeach the credit of White as a witness. If so, his testimony would have been incompetent upon the ground that the attention of White was not called to *the place where* the supposed contradictory statement was made, even if it should be regarded as competent in any way to impeach the credit of a party accused when offered " to testify as to the facts and circumstances of the case."

9. The only remaining inquiry is as to the effect of the Circuit judge expressing his opinion, in his charge to the jury, as to the character of the homicide. The Constitution, Art. IV., § 26, declares that "judges shall not charge juries in respect to matters of fact, but may state the testimony and declare the law." This clause of the constitution has been construed in two cases, (*Redding* v. *Railroad Company,* 5 S. C. 69,) in which, in speaking of this section, it is said : " Its sole intention was to prevent judges from forcing upon juries their own convictions as it regards matters of fact. The juries are the judges of such matters and cannot properly look to the court for a controlling view of the proper conclusions of fact, nor can the court, on the other hand, employ its influence over the minds of the jurors to force upon them its conclusions in such cases." In *State* v. *Green,* 5 S. C. 66, it is said : " We are not to be understood as holding that a judge, in his charge to the jury, is to be confined to a mere narration of the evidence. While he is not at liberty to give his conclusions on any particular portion of the testimony, nor the

result of his judgment as to the whole, he is not restrained from comparing the various parts of it, that the jury may have before them, in as concise a form as possible, the issues upon which they are to pass, so that they may be the better enabled to apply the law to the facts presented in the cause."

While we would not be disposed to use altogether as strong terms as are employed in one of the above extracts, certainly not in reference to the case under consideration, we agree in thinking that the real object of this clause of the constitution is to leave the decision of all questions of fact to the jury exclusively, uninfluenced by any expressions of opinion by the judge, whose position would very naturally add great weight to any opinion he might express upon any question of fact arising in a case. While, therefore, the judge is not expected to confine himself to a mere statement or repetition of the testimony as it was delivered, but may place it before the jury in the order in which it relates to the propositions which it is adduced to support or contradict, by pointing out the questions of fact which arise and calling the attention of the jury to the evidence applicable to such questions, yet he should carefully avoid expressing any opinion which he may have formed from the facts, leaving it for the jury to draw their own conclusions unbiased by any impressions which the testimony may have made upon the mind of the judge.

In this case there does not seem to be any question as to the fact that the prisoner was the person who inflicted the fatal wounds, and the only question, therefore, for the jury to determine was the character of the homicide. This being the case we think it was a violation of the rule for the judge to say to the jury " that no doubt a cruel, brutal and savage homicide had been committed." This certainly was expressing to the jury, in very decided terms, the opinion which the judge had formed from the testimony of the character of the homicide, and was well calculated to influence the minds of the jurors in the determination of the important inquiries in the case, whether the character of the homicide was such as to make it murder, manslaughter or reduce it to a killing in self-defence. It is very true that no one who knows the distinguished judge who presided at the trial of this

case would for a moment suspect that in using this language he had the slightest design to influence the jury, but still its natural, and we may say, its inevitable tendency would be to incline the jury to take the same view of the character of the homicide as that taken by the presiding judge.

The admonition given to the jury at the close of the charge, though eminently proper, "that the law makes them the sole judges of the evidence, and that the judge can express no opinion on the facts, or if he does they are not bound by it," was not, in our opinion, sufficient to do away with the effect of the previous expression of opinion as to the character of the homicide in question. For the jury are not only not bound by any expression of opinion by the judge as to the facts, but the object of the constitutional provision is to preserve the jury from being in any way influenced by the judge's opinion as to the facts, and when, as in this case, a very decided opinion is expressed by the judge as to the real point in issue—the character of the homicide—we think it not unlikely that some or perhaps all of the jury may have been influenced by such an expression of opinion from so high a source, and that, therefore, a new trial should be granted.

The judgment of this court is that the judgment of the Circuit Court be reversed and that the case be remanded to that court for a new trial.

SIMPSON, C. J., and McGOWAN, A. J., concurred.